# GENERAL SESSIONS—NEW YORK COUNTY, June, 1916.

## THE PEOPLE EX REL. McSHAW v. JULIUS KELLER.

### (96 Misc. 92.)

CITY OF NEW YORK—CODE OF ORDINANCES OF—APPLICATION TO RESTAURANTS AND GRATUITOUS ENTERTAINMENTS.

Section 1 of article 1 of Chapter 3 of the Code of Ordinances of the city of New York which provides that " No person shall exhibit to the public in any building, garden or grounds, concert room or other place or room within the city, any interlude, tragedy, comedy * * * until a license for the place of such exhibition for such purpose shall have been first had and obtained," does not apply to a restaurant and to gratuitous entertainments furnished to patrons as a mere incident to the prosecution of a restaurant business.

APPEAL from a judgment of conviction of a Magistrates Court.

*Edward M. Bernstein,* for appellant.

*Lamar Hardy, Corporation Counsel (Terence Farley. E. Crosby Kindleberger* and *George P. Nicholson, Assistant Corporation Counsels,* of Counsel), for respondent.

CRAIN, J.:

Appellant appeals from a judgment of a Magistrates Court convicting him of violating Section 1 of Article 1 of Chapter 3 of the Code of Ordinances of the City of New York. This section in question is entitled " exhibitions and performances to be licensed," and reads: No person shall exhibit to the public

in any building, garden or grounds, concert-room or other place or room within the city, any interlude, tragedy, comedy, opera, ballot, play, farce, minstrels or dancing, or any other entertainment of the stage, or any part or parts thereof, or any equestrian, circus or dramatic performance, or any performance of jugglers, or rope dancing, or acrobats, until a license for the place of such exhibition for such purpose shall have been first had and obtained, as hereinafter provided."

Appellant was the president and general manager of Maxim's Hotel and Restaurant Company. Maxim's was a restaurant. It had no stage, no curtain, no wings, no aisles or passageways such as are usually found in theatres, and no room for standing except in and about the chairs occupied by patrons. It had a balcony, a stairway leading from the balcony and a floor space at the foot of the balcony stairs. It did not advertise a show. It advertised: " New Midnight Cabaret, 1916 Edition, every night at dinner, 7:30 p. m., and supper, midnight." Upon the margin of the advertisement appeared a figure in burlesque costume. No admission fee was charged.

On the night of appellant's arrest an exhibition or performance took place in the floor space between guests' tables at the foot of the balcony stairs and in the balcony itself. Performers dressed in rooms back of the balcony and used the stairway before and after each act. The entertainment was decent. It consisted of dancing and singing, without plot, dialogue or continuity of action, but was similar to that commonly seen at comic opera or variety theatres. There was an orchestra of three, namely, a violinist, pianist and banjoist; a chorus of eight girls, a male and a female singer and male attendants. All took part in twelve numbers, in nearly all of which the various performers appeared in different costumes, using such things as celluloid balls, Irish shillalahs, telephone instruments, flags of various nations, a May pole of silken streamers and a jinriksha. The lights were lowered in the

restaurant and two spotlights were used. No programs were distributed or available.

Maxim's dispensed liquors under a state liquor license and had a dance license. It did not have the license referred to in the statute for the alleged violation of which appellant has been convicted.

A license is issued for revenue and oversight. The public derived revenue from appellant under his state liquor license and dance license. The authorities exercised oversight over appellant's premises under these licenses.

The chapter in which section 1 is found is entitled " Amusements and Exhibitions." These words describe the matters therein treated. It contains three articles—article 1, entitled " General Performances; " article 2, " Motion Picture Exhibitions," and article 3, " Common Shows." Article 1, section 1, requires, as we have seen, certain exhibitions and performances when given in certain places to be licensed. The prohibition as therein contained against exhibition without a license is limited, first, to a public as distinguished from a private exhibition; secondly, to an exhibition given in stated places, and thirdly, to an exhibition of a designated description. The article provides in section 2 for the issuance of licenses for the places and exhibitions and performances mentioned in section 1 and therein confers discretionary power upon the commissioner of licenses to prescribe the conditions upon which such licenses shall be issued and the provisions to be inserted in them. It provides in section 3 for the commutation of license fees, in section 4 for the revocation of licenses, in section 5 for the restraint of those opening or advertising to open for performances or exhibitions certain places. By section 6 it exempts certain places and performances from the provisions requiring the obtainment of licenses, and by sections 7, 8 and 9 it specifically provides for conditions to be maintained in certain classes of places required to be licensed. Section 10 of article 1 relates to Sunday ob-

servance, section 11 of the sale of liquors and the employment of female waiters, and section 12 to ticket speculators.

Sections 7, 8 and 9 do not apply to all the varied places required to be licensed by section 1, but only to certain classes of such places, and section 12 refers to any duly licensed theatre, concert hall, place of public amusement, circus, common show or any place of public amusement for which a license is not required by law.

Article 2 defines motion pictures, motion picture theatres, open air motion picture theatres, and provides for the control of motion picture theatres, for the obtainment, issue and reissue of licenses for the same, and for means of egress. It prohibits obstructions, contains provisions for fire prevention, care of films, presence of fire extinguishing appliances, for heating, lighting, ventilating, for sanitation and cleanliness, for the safeguarding of the public morals, and provides in section 42 that the provisions of the article shall not apply to motion picture exhibitions with or without charge for admission, conducted under the direct management of educational or religious institutions, etc. It then provides that no person shall operate any motion picture apparatus unless he shall have been duly licensed. It then contains provisions relating to applications for such licenses, etc. Article 3 relates to and defines common shows.

The ordinance is a proper subject for judicial interpretation and construction, and a decision in this case requires that it be construed and interpreted.

It is urged in support of the judgment that appellant's performance was in a place mentioned in the ordinance; that the ordinance applies to performances given in restaurants, and that there is no room for interpretation by the court of the ordinance, as the language is plain and unambiguous.

The words used in the section in question; as we have seen, to describe the places required under certain circumstances to be

licensed, are " any building, garden or grounds, concert-room or other place or room."

It is doubtless true that the language above quoted is ordinary and its meaning, when correctly used, plain. In this law, however, it is inaccurately and inexactly used and its meaning is therefore not plain. As used in the law, its meaning is neither ascertainable by common usage nor by reference to dictionaries. That it is inaccurately and inexactly used is shown, *first*, by considering in their relation to one another the descriptive words quoted from section 1; *secondly*, by considering the manifest tautology and surplusage if each word is to be given either its meaning by common usage or lexicographers, and *thirdly*, by contrasting the words so used with words of place description as found in other sections of the article and chapter. A room whether it be a concert-room or other room is a subdivision of a building or the building itself where the structure contains but one room. It follows that if the word " building " is to be given its common and correct meaning, the word " concert-room " and the word " room " are surplusage, for an exhibition to the public in a concert-room is an exhibition in a building, and so is an exhibition in a room. It must be assumed that the compound word " concert-room " and the word " room " were used because it was not thought by the framers of the law that such places would be covered by the use of the word " building." It is thus plain that the word " building " is used in a restrictive, inaccurate and inexact sense. Again if the words " or other place " are to be literally construed, or according to what might be called their plain meaning when correctly used, they so broaden the words " building, garden or grounds, concert-room, etc.," that all these words become surplusage and the prohibition against exhibiting to the public certain performances without a license is seen to be a prohibition against doing so in any place within the city. It may therefore be said that while the language

quoted is broad, it is language of limitation and that the word "building," which is a term broad enough to include poorhouse and palace, prison and court-house, meeting-house and cathedral and well-nigh every human structure upon land, is not used in this sense in the statute under consideration.

As stated, the lack of precision or exactness of meaning in the use of the words in section 1 becomes still more apparent by contrasting them with the descriptive words as used in other sections and by the order and sequence in which such words are used in such other sections. Thus in section 3 the words are " a theatre, a circus, a concert room, or other building or place whatsoever "; in section 5 " any theatre, circus, or building, garden or grounds, concert-room or other place "; in section 6 " any building, hall, room or rooms "; in section 11 " auditoriums or lobbies," and in section 12 " licensed theatre, concert hall, place of public amusement, circus, common show, etc."

We have, in a word, a loosely drawn, inaccurately worded statute and therefore a statute which it becomes the duty of the court to interpret in the light of well-recognized principles of statutory construction.

Reason and authority combine to require that the ordinance be interpreted in such manner as to exclude from the requirement as to license performances gratuitously furnished as mere incidents to a business not itself required to be licensed.

Appellant had a common-law right to cause to be done what is said to have been done at the time when done and the place where done. The statute is penal in character and in derogation of the common law. It makes criminal an act otherwise lawful and is not to be strained beyond its plain meaning to enlarge the field of crime. It must be construed with strictness in favor of the person against whom it is sought to be applied, and, moreover, a construction must be given to it calculated to give effect to the object of the law-making power not unreason-

able in its consequences. Such a consideration under the law of *ejusdem generis* shows that there are no facts disclosed by the record bringing appellant within its purview.

The meaning of section 1 of article 1, being the section for the alleged violation of which appellant has been convicted, is to be ascertained from its language taken in conjunction with the context, that is to say not merely in conjuction with the other sections of article 1, but in conjunction with all the provisions of the chapter and in the light of the circumstances, moreover, that the restaurant business as such is not included in the business required to be licensed by chapter 14 of the same code.

The sums to be paid under the ordinance for licenses differ. They depend upon the place where the performance is to be given and its nature or character. While no reason is expressed for this differentiation and for the exemption of certain performances from the requirements as to license, it is plain that those from giving which larger revenue may be expected are required to pay the larger sums. Thus theatres must pay more than concert-rooms, and concert-rooms more than moving picture places, and these more than common shows; and performances given where the population is great more than those where it is sparse, as in Richmond, while performances and entertainments by amateurs are under certain circumstances producible without a license. This differentiation of license charge and exemption from license requirement indicate that that required to be licensed is the prosecution of certain businesses in which the thing sold, so to speak, is a right to witness a performance and in which the business profit comes from the public's purchase of such right, and that gratuitous exhibitions incidential to and in mere aid of the enlargement of an independent business not itself required to be licensed are not included. In other words, what may be called a graduated scale of license charge, based seemingly upon consideration of the

extent of pecuniary profit derivable from the business licensed, indicates an intent to exclude exhibitions, performances and entertainments, not primarily done for direct pecuniary profit. The reference in section 2 of article 1 to tickets or tokens of admission emphasizes this intent. While, of course, it cannot be said that the requirement that certain public exhibitions, performances and entertainments be licensed is limited to those for which admission tickets are issued, the provision in section 2 that the commissioner of licenses may include in any license issued conditions respecting such tickets or tokens indicates that it was those exhibitions, performances and entertainments to which admission was by ticket or token which the lawmakers had in mind and not such gratuitously witnessable, as in the case at bar, by eating and drinking patrons of a restaurant.

Section 3 of the law relates back to section 1. Appellant's place was clearly not a theatre within section 3. The word " theatre " is defined in the Standard Dictionary as a building especially adapted to dramatic, operatic or spectacular representations, a play house, and in the Century Dictionary as a building appropriate to representation of dramatic spectacles, a play house, a room, hall or other place with a platform at one end and ranks of seats rising stepwise as the tiers recede from the center, or otherwise so arranged that a body of spectators can have an unobstructed view of the platform. A theatre usually has among other parts an auditorium, an orchestra circle, parterre row, dress circle, etc.

Theatres are made the subject of special provisions in article 25 of chapter 5 of the Code of Ordinances known as the Building Code. That article is entitled, " Theatres and other places of public amusement." It contains many minute provisions applicable to modern theatres, opera houses or other buildings used for theatrical or other operatic purposes or for public entertainments. There is no pretense that appellant's place

complied with these requirements or was regarded by the authorities as a theatre within the provisions of article 25.

In article 23 of the same code, section 490, restaurants as such are spoken of. The word "restaurants" is there used immediately after the word "theatres." It is plain that a restaurant and a theatre are different things. It is equally plain that appellant's place was not a circus or concert-room within this section (section 3). A circus is defined in the Standard Dictionary (Students' Edition) as a large inclosure, with parellel sides, with one end rounded for races; a show in which feats of horsemanship, tumbling, strength, etc., are exhibited; and a concert-room evidently means a place in which musical, as distinguished from dramatic, performances are usually given. But section 3, after the compound word "concert-room," adds "or other building or place whatsoever." This is very broad language, but it is used in an inaccurate and restrictive sense. Not merely the places mentioned in section 6 of the article are excepted from those which would otherwise be included by this language, but likewise the places mentioned in articles 2 and 3, as will appear by a consideration of sections 32, 60 and 61.

There is a difference between a place of public accomodation and a place of public amusement. Theatres and concert-halls are places of public amusement; restaurants and hotels places of public accomodation. Some legal principles are applicable to both because each has a public character. They are, therefore, sometimes, but not always, grouped together. They are so grouped in section 40 of the Civil Rights Law as amended by chapter 265, Laws of 1913. They are not so grouped in the ordinance under consideration. The circumstance that they are sometimes grouped by law together and are not so grouped in the law involved in the case at bar shows a legislative intent that the law shall apply alone to places of public amusement as

distinguished from places of public accomodation, and that therefore appellant's restaurant is not within its provisions.

The opinion of the learned magistrate suggests that section 11 of the ordinance indicates a public policy to prohibit the sale of liquors where performances are given, and that the statute should not be construed so as to legalize an act without a license which could not lawfully be done where a license is obtained. It is in part upon this theory that appellant has been condemned for not having a license under section 1 of the law, when it is contended that under the law he could only obtain such a license by abandoning on the premises to be licensed the business which by law he has been licensed to carry on. Under section 11, wine, beer or strong or spirituous liquors cannot lawfully be sold or furnished to any person in the " auditorium " or " lobby " of any place of exhibition or in any apartment connected with such an auditorium or lobby by any door, window or aperture. From this limited prohibition the section then excepts, if permitted by the commissioner, such sales during vocal and instrumental concerts. Appellant's restaurant has neither auditorium nor lobby and of course therefore no apartment connected with an auditorium or lobby, and those who eat and drink at its tables are not described by the words " audience or spectators," as used in section 11. Thus the section in its entirety strongly re-enforces the argument that restaurants like appellants do not fall within the purview of the ordinance.

As stated, the language of the ordinance leads irresistibly to the conclusion that it was not intended to cover exhibitions or performances given as mere incidents to transaction of an independent business not required to be licensed.

Indeed, the able opinion of the learned magistrate proceeds upon the assumption that the ordinance does not require the licensing of a performance merely incidental to a business not required to be licensed. He held, however, in substance that

the advertisement alluded to compelled a finding that in the case at bar the performance given could not be said to be incidental to appellant's restaurant business. The test as to whether a given exhibition or performance is or is not a mere incident of an independent business is the motive or purpose for which it was done, the presence or absence of custom in the particular business regarding the doing of the thing done, and the difference or identity of the method of doing it from the method customarily employed and naturally employable if done as the principal enterprise or main thing. The application of these tests shows that the performance given in appellant's restaurant was within the rule stated a mere incident of appellant's restaurant business. The advertisement names the dinner and the supper hour at appellant's restaurant. It uses the word "cabaret." This word is of French origin and is defined in the Standard Dictionary as a tavern or wine shop and in the Century Dictionary as a pot-house, tavern, alehouse, a tippling and victualing house, tent or booth, a house where liquors are retailed. A reading of the advertisement shows that its plain intent was to induce persons to eat and drink in appellant's restaurant by reason of the amusement or entertainment which would be furnished to them while eating and drinking there. The clear intimation in the advertisement was that if such persons wished to see the performance they must become eating or drinking patrons of appellant's restaurant. The advertisement was thus in aid of appellant's restaurant business, and the performance was in aid of it. It was given to induce patronage. The fact that appellant inserted the advertisement did not change the relation which the performance bore to appellant's restaurant business. If otherwise it was incidental to that business it continued to be so despite the advertisement. Nothing in the fact of advertisement or the wording of the advertisement made it otherwise.

Many cases are cited in the briefs submitted by appellant

and respondent.  Most deal with questions of statutory construction.  They lay down principles applicable to the construction of the statute involved, but they arose under different laws and dissimilar facts.   They throw light, by analogy, as to what the decision should be, and are followed, though not controlling nor directly in point.   Six are excepted from this characterization, namely, Mayor, etc. v. Eden Musee American Co., decided by the Court of Appeals in June, 1886, and reported in 102 N. Y. 593; People v. Royal, decided by the Appellate Division of the second Department in December, 1897, and reported in 23 App. Div. 258; Weistblatt v. Bingham, decided by the Supreme Court, Kings County Special Term for Motions, in March, 1908, and reported in 58 Misc. Rep. 328; People v. Campbell, decided by the Appellate Division of the First Department, in May, 1900, and reported in 51 App. Div. 565; People v. Martin, decided by the Court of Special Sessions, New York County, January, 1912, and reported in 137 N. Y. Supp. 677, and People on the Complaint of O'Neil v. Michaud, decided by the City Magistrate's Court, First Division, Fourth District, in October, 1913, and reported in the New York Law Journal of November 5, 1913.

In the first case (Mayor, etc. v. Eden Musee American Company) it was decided that the provision of the New York Consolidation Act providing for the licensing and regulation of places of amusement was intended to include all classes of public exhibitions such as are usually conducted upon a stage for the observation and amusement of the public, and that a place of public amusement where concerts were given upon a stage was within the terms of the statute and was required to pay a license fee.   That case held that a room or alcove opening at an elevation into a larger room or hall on a level with a high gallery encircling the hall was to be considered in connection with what was done in it " a stage."   In that case the business carried on by the defendant was that of conducting a place of

public amusement to which visitors were attracted by the entertainment offered and to which an admission was charged and which anybody could attend upon payment of the price.

In the second case (People v. Royal) it was held that a person who hired rooms on a public street where he and an assistant explained and illustrated to the public tricks and devices practiced by gamblers and swindlers for the purpose of inducing those present to purchase copies of a book entitled, " Gambling and Confidence Games Exposed," no admission fee being charged or money paid except by purchasers of the book, was not engaged in conducting an " exhibition " within the meaning of a city ordinance requiring persons engaged in giving exhibitions to procure a license, and that the term " exhibition " as used in the ordinance there under consideration only embraced cases where the exhibition itself was the principal thing and where the exhibitor derived or expected to derive profit therefrom, and that it did not extend to a pure trading scheme. The opinion, which is *per curiam*, does not cite any cases.

In the third case (Weisblatt v. Bingham) it was held that an exhibition of motion pictures in an ice cream saloon for the purpose of attracting customers, to which no entrance fee was charged, was not within section 1472 of the Greater New York Charter, which required the payment of a license fee of $500 for exhibitions specified therein; that such exhibition was a common show within the meaning of section 51 of said charter and the ordinance adopted by the board of aldermen requiring common shows to be licensed. Judge Crane in writing the opinion in that case cites among other cases People v. Royal.

In the fourth case (People v. Campbell) it was held that piano playing during the evening in the balcony of a room licensed only to be used as a liquor saloon, in which is an unused stage, no admission fee being charged, did not constitute a misdemeanor within the meaning of section 1472 of the

charter of the city of New York (Laws of 1897, chap. 378), requiring a license for an exhibition, interlude, minstrelsy " or any other entertainment of the stage." The opinion in the Campbell case shows that there was in fact no exhibition. Mr. Justice Ingraham, writing the opinion of the court, says at page 566: " It seems that the performance upon this piano was not an exhibition within the meaning of this definition (referring to the statute cited), which evidently related to the classes of public exhibitions usually conducted or produced upon a stage at which the public attend for the purpose of seeing the exhibi-tion and not to a case where music is performed as a mere incident to any business where no admission fee is charged."

In the fifth case (People v. Martin) the Court of Special Sessions, Justice Deuel writing the opinion, held that an entertainment provided by the management of a restaurant, consisting in dancing, singing, etc., did not constitute a public exhibition within the Greater New York Charter (Laws of 1897, chap. 378), sections 1472, 1473 and 1474, which make it a misdemeanor to conduct a public exhibition without a license where the entertainment constitutes gratuitous contribution by the management to the guests' entertainment.

In the last case (People ex rel. O'Neil v. Michaud) Magistrate Levy held that the defendant who was charged with a violation of section 1472 of the Greater New York Charter, because he gave a public exhibition at No. 1465 Broadway, advertised as a musical comedy, called " The Hour of Mirth," without pro-curing a license from the police commissioner, should be dis-charged and acquitted, as the statute was not violated by what the defendant had done. In the course of his opinion the magi-strate says: " I think the test is this: If the direct and main object be pecuniary gain a license to exhibit is necessary, but if the exhibition be free and given solely to hold, attract or in-crease the patronage of an established business, a license is un-necessary."

On the facts there is nothing to distinguish People v. Martin and People *ex rel* O'Neil v. Michaud from the case at bar. While neither decision is rendered by a court of superior criminal jurisdiction nor by an appellate tribunal, the reasoning in them is persuasive. The facts in the other four cases are in varying degrees dissimilar from those in the case at bar, but the opinions furnish grounds for the reversal of the judgment appealed from.

One may not carry on without a license any of the business referred to in section 1 of the ordinance by merely furnishing refreshments. One may not combine a public amusement business in any of its varied forms required to be licensed by section 1 with the restaurant business or some other business and successfully urge that by virtue of such combination he is not required to obtain a license to do something which but for such combination he could not lawfully do under section 1. The test as to whether there is such a combination must differ in different cases. Each case must be determined upon the facts presented, bearing in mind that it is not the extent of patronage but rather the sums charged and for what charged. In passing it may be stated that in the case at bar there is an absence of evidence on this important point.

Finally, nothing in this opinion is to be construed as preventing the prosecution under the section of the ordinance construed of those who as a mere subterfuge to evade its provisions while conducting a public amusement business supply food or drink in connection with or as an incident to the same; that is to say, the supplying of food and drink cannot be used as a subterfuge to evade or avoid the taking out of a license under the ordinance involved by those conducting a public amusement business.

Appellant, as stated, is under the scrutiny of the public authorities by virtue of the licenses which he has. If it is desired that those conducting restaurants be prohibited from

furnishing gratuitous entertainments to their patrons or prohibited from doing so except when specifically licensed, that result can only be obtained by appropriate legislation.

The judgment of conviction is reversed because the law is inapplicable to a restaurant and to what is done as a mere incident to the prosecution of a restaurant business.

Judgment reversed.